HAMILTON v. THE NORTHWEST LAND COMPANY, INC.

5-331                                         268 S. W. 2d 877

Opinion delivered June 14, 1954.

*Carl Langston* and *Wayne Foster,* for appellant.

*Roy Danuser, Catlett & Henderson, Lasley, Spitzberg, Mitchell, Hays* and *Wright, Harrison, Lindsey & Upton,* for appellee.

GRIFFIN SMITH, Chief Justice. Clara Hamilton was adjudged insane by Pulaski Probate Court October 30, 1939. She entered the State Hospital for nervous diseases that day and has remained there. At the time of her adjudication she was owner of 113 lots in Hamilton & Brack's Addition to the City of Little Rock and a home on Cedar Street. A guardian was immediately appointed, but he died about 10 years ago. H. J. Burney, a Little Rock attorney, succeeded the decedent.

The present controversy arises out of four transactions wherein sales of the ward's property were ordered

by Probate Court. In December, 1952, Don Cameron, a Little Rock abstracter, offered to purchase all of Block Five at a private sale. The guardian petitioned to make this sale and a court order was entered immediately. On May 25, 1953, the guardian requested authority to sell 56 lots to Gladys Knighton, and in a separate petition asked leave to sell 16 lots to Ed Lester, trustee. An order was entered fixing May 25th as the date of hearing. Appraisement, order of sale, report of sale, order confirming sale, and an additional bond, were filed the same day.

On June 3, 1953, the guardian petitioned to sell five lots to Floyd Barry, and again appraisement, report of sale, and order of sale, were entered the same day.

On August 27th, two nieces and a nephew of the incompetent intervened in the probate proceeding. They alleged that the sales were fraudulent and should be set aside. The guardian was charged with neglect amounting to legal, though not intentional, fraud; and his removal was requested.

The intervention was filed during the term of court the sales had been ordered, and it was requested that the approving directives be reopened and the transactions nullified. The court promptly ordered hearing, and after a careful procedural course denied the motions.

Appellants contend that the sales were in violation of various sections of the Probate Code and that the guardian had failed to exercise the required diligence to ascertain whether the price received (approximating $50 per lot) was a fair standard of worth.

The property is located close to Little Rock Junior College and Fausett's Broadmoor Addition. Each adjoins Hayes Street on the western boundary of Little Rock. The developments are of comparatively recent origin and it is argued that they increased the value of all surrounding property.

Several persons familiar with property in Little Rock and in the area under examination testified as to market values. As is frequently the case, there was a

wide divergence of opinion. Many influencing factors received consideration.

The principal contention of appellants is this: The guardian was admittedly uninformed respecting the property. He made no effort to acquaint himself with factors bearing on the advisability of accepting offers to purchase in stated amounts. His failure to affirmatively represent the ward's interest, and to handle the trust in a manner at least approximating methods he would have applied to his own business, are alleged to have tainted each transaction to a point of avoidance. It is urged that the court's refusal to set the sales aside amounted to an abuse of discretion.

A discovery deposition was taken from Burney and attached to a motion to set aside. Burney testified that the first sale now questioned was made to Cameron, who came to his office and offered to buy Block 5. All the property had forfeited in 1938 for non-payment of the 1937 general taxes and had been certified to the state in 1941. Burney agreed to sell to Cameron, and appraisers suggested by Cameron were chosen. The guardian had frequently disposed of single lots at $50 to persons holding tax forfeiture deeds. Cameron expected to get the lots in Block 5 for $50 each. The appraisers, however, fixed the price at $75. An order of sale was made in December, 1952, but was not consummated until May 20, 1953.

In all subsequent sales the names of appraisers were suggested by purchasers. Blank appraisals were given to Burney. The pleadings utilized in handling procuring orders were prepared by the purchasers or their counsel, except the sale to Floyd Barry. It was prepared by Burney.

Burney did not know how close Little Rock Junior College was to this property, and his information was only general concerning Fausett's development of Broadmoor Addition. He understood that Hayes Street had been paved, but did not know where his ward's property lay with reference to Hayes.

Previously, no one had offered more than $50 a lot, said Burney. Some public sales of single lots were made and no other than the ultimate purchaser appeared. The last public sale was in 1952. Until the lots were appraised at $75 each in the Cameron transaction none sold for more than $50. The guardian last saw the realty in 1945 or 1946. Because of the condition of title as affected by tax forfeiture Burney felt that the value was precarious.

Cameron, purchaser of Block 5, testified that he suggested the names of appraisers to Burney only after Burney requested him to do so.

Cameron employed counsel to assist him in the purchase, and this attorney prepared the preliminary papers and the orders. The petition relating to lots in Block 5 recites that sale was conditioned on the guardian's redemption from a 1930 tax sale. Further conditions were that Cameron would pay all court costs, attorneys' fees, abstract expenses, and provide revenue stamps incidental to redemption. Cameron had been advised that it would facilitate matters if the guardian proceeded to redeem instead of having a purchaser do so.

Before redemption was accomplished Floyd Barry acquired the tax title from Ned Dumas, the original tax title purchaser, and Cameron eventually negotiated a settlement with Barry so that Block 5 was divided,—the east half to Barry and the west to Cameron. The amounts each had paid were added, each paying 50%.

The condition of the title was ascribed by Cameron as a factor materially affecting values. The purchase was speculative, the property was unimproved, there was no ready access to utilities, and persons were in possession of certain portions which clouded the title. Cameron's partner owned 20 acres immediately across the street from Block 5. It was Cameron's thought that he and this associate would gradually accumulate enough lots to "partially control the situation"; but they were apprehensive each time they bought the property that

it might have to be held for a long time before a profit could be realized.

In his position as an abstracter Cameron knew, in February, 1953, (from a newspaper article), that Broadmoor Addition was to be developed, but the actual location had not been settled. He regarded the presence of Little Rock Junior College—about three-quarters of a mile from Block 5—as having no connection with the value of Block 5.

On being questioned about the purchase of five lots in Block 3 from a man named Lee for $750, Cameron said that if the guardian had been able to produce a good title without uncertainty of litigation the lots in Block 5 might have been purchased from the guardian at the same price.

Several real estate brokers testified on behalf of appellants. They had appraised the property and they gave varying estimates of its worth—values all substantially in excess of the price paid by appellees. These witnesses thought the announcement that Broadmoor Addition was to be developed would immediately increase the value of the property and that actual development would further enhance it.

Elbert Fausett, the developer of Broadmoor Addition, testified that he paid $52,000 for the land on which the Addition was located. It includes 190 acres. His contract for actual development was not let until June of 1953 and the plat was filed in August, 1953. He did not purchase any property in Hamilton & Brack's Addition because he didn't care to expand farther west. He said: "I couldn't take the gamble and the risk and then wait on the addition to clean out and become more desirable. . . . I consider this property in the same class as other property west of my Addition." In his opinion Hamilton and Brack's Addition is not suitable for development in the manner of Broadmoor. The announcement of a development is not always followed by actual improvement, because plans are sometimes abandoned. The announcement incidental to Broadmoor appeared in February, 1953.

Louis Nalley, a real estate broker called by appellees, testified that he acquired a tax title to Lots 10 and 11 in Block 7, Hamilton & Brack's Addition, in January, 1952, and purchased a guardian's deed in February, 1952. He described the condition of the property as of May, 1953, as "raw land". In his judgment the fair market value at that time would range from $40 to $75 a lot. His opinion was predicated on the lack of utilities, location of the land, and the fact that he himself was an owner of property in the addition and had bought and sold lots there. It was common knowledge that these lots could be purchased from the guardian. Mr. Nalley was one of the appraisers.

Other real estate brokers testified on behalf of appellee and each felt that the mere announcement that Broadmoor was to be developed did not influence the value of Hamilton & Brack's Addition.

Appellants complain that the sale proceedings and confirmation were fatally defective because no sworn evidence was presented to the court to support the petitions for sale (Don Cameron's petition being the only one that was verified by affidavit); that the appraisers were selected by the purchasers instead of the guardian or the court; that the guardian was unfamiliar with the location and value of the lands and had not exercised diligence in keeping abreast of valuation changes; that contrary to the guardian's belief the title was not so clouded as to depress the value and justify sales at the low figure shown; that no facts existed to substantiate actions of the guardian—this for the reason that the estate was supplied with funds sufficient to meet current needs of the ward, hence the petitions requesting. sales were not supported by a showing of reasonable necessity.

Because opinions as to the true value of the property were so divergent we have concluded that no error resulted from the court's refusal to set the sales aside because of price inadequacy. Value standards are so flexible that failure of the probate judge to accept appellants' version cannot be said to involve an erroneous consider-

ation of the weight of evidence. Likewise, confirmation of the sales cured all errors not jurisdictional or clearly violative of some fundamental right secured through the provisions of the probate code.

The duties of a guardian of the estate of an incompetent are defined in Ark. Stat's § 57-624. The guardian must "exercise due care to protect and preserve [the property]". And "to the extent applicable, the law of trusts shall apply to the duties and liabilities of a guardian of the estate."

Sales by guardians are controlled by the decedent's estate law, Ark. Stat's § 62-2707 to 62-2723 inclusive. Under the provisions of Ark. Stat's § 62-2710, an order of sale is secure against collateral attack but an appeal from an order of confirmation permits appellate review not only of the order of confirmation but also a review of the original order authorizing the sale, although time for appeal may have elapsed. Sales not in substantial compliance with the provision of the code are defined as void.

The controversy resolves itself into one paramount question: Was the price received so demonstrably disproportionate to lot values as to require us to say that the trial court abused its discretion? Stated differently, was the evidence of enhanced worth of a character necessitating a finding that the guardian, in the first instance, was derelict in his duty, and in the second instance that the court improperly appraised the evidence relating to progressive steps in area development thought by appellant to have been so generally known that the purchasers were parties to unfair tactics?

Because of the broad alternative rights vested in the Probate Court in matters such as we are dealing with and the better public policy of sustaining judicially-directed sales unless imperative reasons are shown for avoidance, the judgments are affirmed.

Mr. Justice McFADDIN dissents.